IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| TEIKOKU PHARMA USA, INC., a California corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12-1864 |
| JAR LABORATORIES, LLC a Nevada limited liability company, | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION
FOR ACCELERATED AND EXPEDITED DISCOVERY**

**I.  INTRODUCTION**

Plaintiff Teikoku Pharma USA, Inc. ("TPU") requests that the Court permit TPU to take focused, expedited and accelerated discovery from defendant JAR Laboratories LLC ("JAR") and up to three non-party witnesses to discover the full nature of JAR's false advertising and the scope of harm likely to result. Recent internet advertising and press releases demonstrate that JAR is poised to begin (or has already begun) shipping an over-the-counter ("OTC") lidocaine patch product ("LidoPatch") that it falsely portrays as an equivalent to TPU's prescription patch product Lidoderm®. TPU anticipates moving for preliminary injunction based on JAR's unsubstantiated claims about Lidopatch's effectiveness and its false and misleading efforts to portray Lidopatch as an equivalent of Lidoderm®.

Because the scope and effect of JAR's false and misleading advertising and marketing efforts are not fully known, TPU requests that the Court excuse the parties from the meet-and-confer requirement of Rule 26(d) and permit the discovery included here as Exhibits A, B and C on shortened notice.

## II. BACKGROUND

### A. *TPU Sells Imports and Sells the "Leading Prescription Patch," Lidoderm® in the United States.*

TPU imports into the United States a topical patch product called Lidoderm®, which it sells to its exclusive distributor in the United States, Endo Pharmaceuticals, Inc. Declaration of Ichiro "Paul Mori ("Mori Decl.") ¶2. The United States Food and Drug Administration ("FDA") approved a New Drug Application ("NDA") for Lidoderm® on March 19, 1999 under §505(b) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. §355(b)), for the relief of pain associated with post-herpetic neuralgia ("PHN"), a painful condition that frequently follows an outbreak of shingles (also known as herpes zoster). *Id.* ¶3. Lidoderm® is a prescription, topical analgesic, self-adhesive patch containing 5% by weight of lidocaine. *Id.* ¶4. Lidoderm® uses a proprietary, hydrogel matrix to control the release of lidocaine into the skin, which, in proper doses, treats pain associated with PHN. *Id.*

Lidoderm® is one of the most frequently prescribed pharmaceuticals in the United States (it ranked number 36 in 2010) and is one of the best-selling pharmaceutical patches of all time, with over $4 billion in total sales to date. Mori Decl. ¶5. Although indicated solely for treatment of pain associated with PHN, much of Lidoderm's® revenue in recent years comes from an increasing number of prescriptions for the relief of pain that is not associated with PHN—in other words, for "off-label" uses. *Id.* ¶6. Off-label prescriptions are both lawful and common, as a prescribing physician is considered to be the best judge of the proper treatment for a given patient.

### B. *JAR's Advertisement and Promotion Campaign*

On February 7, 2012, in a widely disseminated press release, JAR announced the launch of its LidoPatch product, stating that it planned to start shipping LidoPatch to distributors and retailers in "mid-February" 2012. Declaration of Joseph A. Meckes ("Meckes Decl.") ¶2 & Exh. A. JAR's press release prominently claims: "One patch will provide pain relief for up to 24 hours." *Id.* The press release goes on to compare LidoPatch to Lidoderm®, claiming that it has

2

the "same active ingredient as the leading prescription patch." *Id.* This is a clear reference to Lidoderm®, since Lidoderm® is one of the best selling transdermal patches of all time and is the **only** prescription patch that contains lidocaine. Mori Decl. ¶7. The press release further states that JAR is taking advance orders and predicts that LidoPatch will "start showing up on pharmacy shelves in early spring." Meckes Decl. ¶2 & Exh. A.



JAR's website for the LidoPatch product (www.lidopatch.com) makes similar claims of efficacy and equivalence to Lidoderm® and includes images of the packaging that JAR plans to use to promote LidoPatch. Meckes Decl. ¶3 & Exh. B. At right is an image of the LidoPatch packaging taken from JAR's LidoPatch website. *Id.*

In addition to drawing comparisons to Lidoderm® by claiming to have the "same active ingredient," the packaging prominently claims to be "fast acting," boasting that users can "Get pain relief now!" *Id.* And like the February 7, 2012 press release, the LidoPatch packaging claims it only takes "one patch for 24 hour pain relief." *Id.*

Also featured on JAR's website is the advertisement reproduced at right. Again, this advertisement prominently draws a comparison to Lidoderm®

("Relief that lasts all day without a prescription!") and promising immediate, "long lasting" and "real" relief to pain sufferers. *Id.*

### C. *JAR's LidoPatch Packaging and Advertisements Are Misleading*

JARs packaging and advertisements are intended to mislead consumers into believing that LidoPatch is both the equivalent of Lidoderm®, and that it is a safe and effective treatment that can be used as a replacement for Lidoderm®. JAR's repeated references to "leading prescription patch" (i.e., Lidoderm®) and claims that users can get relief "without a prescription" suggest to consumers that LidoPatch is equivalent to Lidoderm®. These representations are intended to mislead consumers to believe that LidoPatch delivers the same dose of lidocaine as Lidoderm®, treats the same indication as Lidoderm®, is as effective as Lidoderm® and is, in essence, interchangeable with Lidoderm®.[1]

The message that LidoPatch is equivalent to Lidoderm®, however, is patently false. While both are "patches" containing lidocaine cut to the same size, the similarities appear to stop there. The Lidoderm® five-percent topical lidocaine patch was approved by the FDA in 1999 as a safe and effective treatment for pain associated with PHN. Mori Decl. ¶3.

Experts in the field believe that Lidoderm's® proprietary hydrogel matrix formulation ensures the appropriate amount of lidocaine through the skin to provide an analgesic effect to sufferers of PHN -- an often debilitating illness. Declaration of Edmund Ross, MD ("Ross Decl.") ¶18. No other lidocaine-containing topical treatment has been proven effective in treating PHN - even those with higher doses of lidocaine. *Id.*

Lidoderm's® unique hydrogel formulation also confers a number of benefits to the patient - quite apart from the mere fact that it contains lidocaine. As noted, Lidoderm's® hydrogel matrix controls the release of lidocaine in a way that other topical lidocaine treatments have been unable to achieve. Ross Decl. ¶¶15-16, 18. Further, unlike other medicated patch

---

[1] TPU believes that JAR is specifically and directly marketing the LidoPatch product to distributors, pharmacies and managed health organizations as low-price, OTC equivalent to Lidoderm®.

4

products, Lidoderm's® proprietary formulation is both adhesive and *soft*, which means Lidoderm® can be applied to, and removed from, damaged or sensitive skin without causing aggravation in even the most sensitive patients. *Id.* ¶21(b). Finally, Lidoderm's® proprietary formulation has been proven to be non-irritating to the skin. *Id.* ¶21(a).

JAR has no proof that its "3.99 percent" lidocaine, plus one-percent menthol, formulation will provide the same relief as Lidoderm® "without a prescription" as it falsely implies in its advertisements. First, the mere fact that LidoPatch contains lidocaine does not mean it will have a therapeutic benefit similar to Lidoderm®. Numerous lidocaine-containing treatments have been tried, but none have had the clinical success of Lidoderm®. Ross Decl. ¶15.

Next, it is apparent from the LidoPatch packaging that LidoPatch contains numerous excipients that are not found in Lidoderm®, which may affect the product's skin absorption and irritation profile as well as the adhesive characteristics of the patch. As noted, one of the key benefits of Lidoderm® is its non-irritating, soft formulation that does not aggravate the sensitive or damaged skin of PHN sufferers. Ross Decl. ¶21(b).

LidoPatch also contains a second "active" ingredient – menthol – that is not contained in Lidoderm® - and not approved by the FDA for treatment of post-herpetic neuralgia. Thus, not only will LidoPatch likely have a distinct (and some might say unpleasant) odor, it may actually cause an adverse reaction by some patients suffering from allodynia. Ross Decl. ¶21(c). Most importantly, there is simply no clinical evidence supporting JAR's implied claim that its product is interchangeable with Lidoderm®.

One of the cornerstone's of JAR's packaging and marketing materials is that a single application of LidoPatch product will provide 24-hour pain relief. JAR's own packaging, however, states that the LidoPatch product should be removed for 12 hours after a maximum of 12 hours of continuous use:

> **Directions**
> ❑ Adults: Apply patch to affected area for a maximum of 12 hours. Do not use more than 1 patch every 24 hours.

5

Meckes Decl. ¶4 & Exh. C. JAR's advertising and packaging implies that JAR has conducted clinical testing or scientific studies upon which it bases this claim. Ross Decl. ¶21. This implied message is false since no such testing or studies exist.

JAR also implies falsely in its February 7, 2012 press release that clinical testing or scientific studies have proven JAR's LidoPatch product to be an effective treatment to a number of ailments. Specifically, JAR states:

> With its ***proven pain relieving active ingredient***, lidocaine, LidoPatch® can provide relief for minor pain associated with: arthritis, simple backache, bursitis, tendonitis, muscle strains and sprains.

Meckes Decl. Ex. A (emphasis added). A potential purchaser of the LidoPatch product would likely be mislead by the use of the phrase "proven pain relieving active ingredient" to believe that the LidoPatch formulation has been "proven" to treat the various listed ailments. There is, however, no "proof" that lidocaine applied using JAR's patch formulation will have any effect at all on any of the ailments listed. Experts in the field agree that whether a topical analgesic effective and non-irritating cannot determined at the formulation stage. Ross Decl. ¶21(a). Any formulation will require clinical testing to prove its effectiveness. *Id.*

### III. DISCUSSION

#### A. <u>Legal Standard Governing This Motion.</u>

Although the parties to civil litigation are typically precluded from taking discovery until they have conferred as required by Federal Rule of Civil Procedure Rule 26(f), the Court has wide discretion to authorize discovery on an expedited basis, including expediting the commencement of the discovery period and shortening response times to written discovery. *Ibarra v. City of Chicago*, 2011 U.S. Dist. LEXIS 114539 at *30 (N.D. Ill. Sept. 28, 2011).

A motion for expedited discovery is most frequently evaluated under the "reasonableness" test. *Ibarra*, 2011 U.S. Dist. LEXIS 114539 at *30. The "reasonableness" test

6

requires a showing that the requested discovery is reasonable "in light of all the surrounding circumstances." *See, e.g., Merrill Lynch, Pierce, Fenner & Smith v. O'Connor*, 194 F.R.D. 618, 624 (N.D. Ill. 2000). In applying the "reasonableness" standard, courts should consider (1) whether the discovery is necessary to determine a motion for preliminary injunction; (2) the breadth of the discovery sought; (3) the reason expedited discovery is sought; (4) the burden on the defendants to comply; and (5) the procedural posture of the case. *Ibarra*, 2011 U.S. Dist. LEXIS 114539 at *32. Good cause for expedited discovery "frequently exists" in cases involving unfair competition. *Pod-Ners, LLC v. Northern Feed & Bean*, 204 F.R.D. 675, 676 (D. Colo. 2002). Under these standards, TPU should be permitted to propound expedited discovery.

**B. The "Reasonableness" Test Is Met And TPU Should Be Permitted To Propound Expedited Discovery.**

*1. TPU Urgently Needs The Discovery Sought To Prepare Its Motion For A Preliminary Injunction.*

In its February 7, 2012 press release, JAR announced that it planned to ship LidoPatch products to distributors in mid-February and that LidoPatch "should start showing up on pharmacy shelves in early spring" 2012. Meckes Decl. Ex. A. TPU is not aware of any LidoPatch product currently available for retail sale. If, however, LidoPatch does become commercially available, the damage to Lidoderm® goodwill and sales will be irreparable.

As noted, TPU anticipates moving promptly for preliminary injunction, but will need expedited discovery to obtain evidence relevant to the Court's determination.[2] A party seeking a preliminary injunction must demonstrate that: (1) it has some likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *Girl Scouts of Manitou Council Inc. v. Girl Scouts of the United States of America Inc.*, 549 F.3d 1079, 1085 (7th Cir.2008). In order to succeed on a motion for preliminary

---

[2] A party is not required to file a motion for preliminary injunction before requesting expedited discovery. See *Arista Records LLC v. Doe*, 551 F. Supp. 2d 1, 8 & n.7 (D.D.C. 2008).

Case: 1:12-cv-01864 Document #: 9 Filed: 03/15/12 Page 8 of 11 PageID #:29

injunction, the movant must show that it has a "better than negligible" chance of success on the merits. *Id.* at 1096 (citing *Ty Inc. v. Jones Group Inc.*, 237 F.3d 891, 897 (7th Cir.2001)).

If the moving party satisfies these three elements, the Court then must consider any irreparable harm an injunction would cause the nonmoving party and any consequences to the public from denying or granting the injunction. *Promatek Indus. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir.2002) (citing *Ty*, 237 F.3d at 895). These considerations are weighed applying a "sliding scale approach" in which "the more likely the plaintiff's chance of success on the merits, the less the balance of harms need weigh in its favor." *Ty*, 237 F.3d at 895–896.

Given JAR's announcement that it planned to ship products in mid-February 2012, TPU will need immediate discovery regarding the potential impact of JAR's false or misleading advertising. To address the elements of a preliminary injunction, TPU should be given an opportunity to find out the scope of JAR's false advertising, including the nature of its advertisements and marketing and the identities of the persons to which it has directed those activities. This would include JAR's efforts to portray LidoPatch as a safe and effective equivalent to Lidoderm®. To determine the degree of irreparable harm that may be caused by JAR's entry in the market, TPU is entitled to investigate the commercial specifics of JAR's manufacturing and sales, including the anticipated sales volume and manufacturing capacity. To evaluate JAR's advertised claims of effectiveness and representations of equivalence to Lidoderm®, TPU will also need discovery into JAR's LidoPatch formulation. This information will be central in the Court's analysis of TPU's anticipated motion for preliminary injunction.

    2.    *The Discovery Sought Is Focused On Issues Relevant To A Motion For Preliminary Injunction..*

Where, as here, expedited discovery is sought in the context of seeking a preliminary injunction, the discovery should be tailored "to specific issues that will be determined at [a] preliminary injunction hearing." *Merrill Lynch*, 194 F.R.D. at 621. To prevail on a motion for preliminary injunction, TPU must show, *inter alia*, that it has a likelihood of proving that JAR made false or misleading statements and that those statements will cause TPU irreparable harm.

8

*See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir.1999) (Lanham Act false advertising claim requires proof of false or misleading statement); *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir.1992) (plaintiff must show "some likelihood of success on the merits" to obtain preliminary injunction). JAR may also try to argue that irreparable harm to its business or negative consequences to the public weigh against granting the injunction. *Promatek Indus.*, 300 F.3d at 811. Accordingly, these issues are legitimate topics for exploration through expedited discovery.

    Here, each of TPU's proposed discovery requests is relevant to the matters that the Court will consider as part of a preliminary injunction proceeding. TPU's proposed discovery is limited to **eight** interrogatories, **eleven** requests for production of documents and a single Rule 30(b)(6) deposition with **twelve** topics. Each of these discovery requests is focused on one or more of the following issues: (1) how JAR has advertised or marketed LidoPatch to pharmacies, distributors and managed care organizations, (2) how JAR's advertisements, packaging and promotion efforts have positioned LidoPatch and how they have been perceived by consumers; (3) whether JAR's marketing efforts have been successful and (4) the differences between LidoPatch and Lidoderm®. The information obtained through this discovery will be directly relevant to TPU's likelihood of success on the merits and the scope of the irreparable harm that TPU will suffer as result of JAR's false advertising campaign.

    TPU is also seeking permission from the Court to take up to three third party depositions of persons who may have been approached by JAR about the LidoPatch product, such as retail pharmacies, pharmaceutical distributors and managed care organizations. TPU does not currently know the identities of these entities but anticipates that this information will be disclosed in JAR's responses to the discovery requests outlined above. These kinds of depositions will be necessary to test JAR's responses and to ensure that TPU is getting the "full story" regarding JAR's efforts to portray LidoPatch in the market as a safe and effective equivalent to Lidoderm®.

9

      *3.*    *The Burden On The Defendant Is Reasonable.*

TPU's proposed discovery requests are limited in scope and appropriate considering the stakes involved. Quite apart from being focused solely on the issues relevant in a preliminary injunction hearing, the proposed discovery requests are few in number and scope. Requiring JAR to answer eight focused questions, provide a limited subset of relevant documents and to sit for a single Rule 30(b)(6) deposition will not work any hardship on JAR.

      *4.*    *The Deadline Proposed For Defendant's Response Is Reasonable.*

TPU requests that Defendant respond to its written discovery within 14 days of service and sit for a deposition within one week of service of notice. Due to the limited nature of TPU's discovery, the requested deadlines will provide sufficient time to conduct any investigation that may be necessary to provide full and complete responses.

## IV. CONCLUSION

JAR's misleading advertising has the potential to cause immediate and irreparable harm to TPU and to Lidoderm®'s goodwill and sales. In the interest of judicial economy and to ensure a full and thorough consideration of the issues, TPU asks the Court to issue an Order (1) requiring JAR to provide responses to the discovery requests attached as Exhibits A and B within 14 days; (2) requiring JAR to designate a representative or representatives to sit for deposition and testify to the deposition topics set forth in Exhibit C at a mutually convenient time and place within one week of service of the notice; and (3) permitting TPU to take up to three third party depositions relating to the issues described in this Memorandum, which may be set within one week of service of the notice.

DATED: March 15, 2012.

                              Respectfully submitted,

                              <u>/s/ Jack J. Carriglio</u>

Jack J. Carriglio
James G. Argionis
Meckler Bulger Tilson Marick & Pearson LLP
123 North Wacker Drive, Suite 1800
Chicago, Illinois 60606
Tel: 312 474 4477
Fax: 312 474 7898
jack.carriglio@mbtlaw.com

OF COUNSEL:
David S. Elkins
Noriyuki Shimoda
Joseph A. Meckes
Squire Sanders (US) LLP
600 Hansen Way
Palo Alto, CA 94304
Tel: 650 856 6500
Fax: 650 843 8777
david.elkins@squiresanders.com
joseph.meckes@squiresanders.com
COUNSEL FOR PLAINTIFF
TEIKOKU PHARMA USA, INC.

11